UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

****************************************

| | |
|---|---|
| Krystal E. Miller         * | |
|   (f/k/a Krystal E. Binder)    * | |
|      Plaintiff,          * | |
|                     * | |
| v.                     * | COMPLAINT |
|                     * | <u>Jury Trial Requested</u> |
| Pike Industries, Inc.      * | |
|     Defendant.         * | |
|                     * | |

****************************************

## I.     <u>Parties:</u>

1.     The plaintiff, Krystal E. Miller, f/k/a Krystal E. Binder, is a resident of the State of New Hampshire with a mailing address of 295 Brown Hill Road, Belmont, New Hampshire 03220.

2.     The defendant, Pike Industries, Inc., is a Delaware for profit corporation with a principal office address and mailing address of 3 Eastgate Park Road, Belmont, New Hampshire 03220.

## II.     <u>Jurisdiction & Venue:</u>

3.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

4.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful disability discrimination employment practices alleged herein occurred within this judicial district.

**III.**    <u>Facts:</u>

     **A.**    <u>Background on Plaintiff's Reading Disability</u>

     5.    Krystal Miller was a Laconia school system special education student who

had an academic assessment in 2002 as follows:

> Krystal was identified as a special needs student due to Specific Learning
> Disabilities. She was referred for testing to "update" documentation of
> her continuing eligibility for this special needs identification.

Exhibit 1 is attached hereto and incorporated herein by reference.

     **1.**    <u>Academic Assessment</u>

     6.    Ms. Miller's school records note that prior assessments documented that

she was of average general intelligence. However, when she was evaluated in 1999, she

was found to have a severe deficit in <u>auditory closure</u> and <u>auditory processing</u> of

speech sounds. Mild or relative weaknesses were also noted in visual closure,

vocabulary development, and auditory memory for inherently nonmeaningful

information. Academically, Ms. Miller showed the impact of her learning <u>weaknesses</u>

<u>in the areas of reading and spelling</u>. Aside from spelling, her writing skills were

assessed as being within the average range for her age. She had average functioning in

mathematics.

     7.    Ms. Miller's Individualized Education Program, or IEP, reflected in the

Student Profile that she "has struggled to develop reading skills as well as mastery of

spelling." Exhibit 2 attached hereto.

     8.    Nonetheless with accommodations as set forth in Exhibit 3, Ms. Miller was

able to qualify for the National Honor Society and graduated, went on to college and

later obtained a Masters in Business Administration, all of which reflect that she can perform well if accommodated for her disabilities.

**B.**     <u>**Hiring at Pike Industries, Inc. in 2017**</u>

9.     During her interview process for the Human Resources Manager position at Pike Industries, Ms. Miller was very open with those with whom she was interviewing including Stacia Maloney (Human Resources Director), Sandra McNeff (Human Resources Assistant) and Katrina Mumford (Public Relations). In a prior conversation with Michelle Noble (Human Resources Manager), Ms. Miller told her she had a learning disability in reading comprehension and spelling.

10.     Ms. Noble and Ms. Miller had a prior work relationship because Ms. Miller had worked at Robert Half (2012-2015) where she would help staff temporary positions for Pike Industries, so Ms. Noble knew her. While filling out additional paperwork, Ms. Miller had brought to Pike Industries the Voluntary Self-Identification of Disability form and additional forms that she had received through email communication that needed to be filled out prior to her first day.

11.     Ms. Miller had a question regarding where she should list that she had a learning disability in reading and comprehension, but was advised that there was nowhere on the form where she could list that she had a learning disability. Therefore, she did not list it on the form below, as she was advised not to do so.

| How do I know if I have a disability? |
| --- |

You are considered to have a disability if you have a physical or mental impairment or medical condition that substantially limits a major life activity, or if you have a history or record of such an impairment or medical condition.

Disabilities include, but are not limited to:

- Blindness
- Deafness
- Cancer
- Diabetes
- Epilepsy

- Autism
- Cerebral palsy
- HIV/AIDS
- Schizophrenia
- Muscular dystrophy

- Bipolar disorder
- Major depression
- Multiple sclerosis (MS)
- Missing limbs or partially missing limbs

- Post-traumatic stress disorder (PTSD)
- Obsessive compulsive disorder
- Impairments requiring the use of a wheelchair
- Intellectual disability (previously called mental retardation)

Please check one of the boxes below:

☐ YES, I HAVE A DISABILITY (or previously had a disability)
☒ NO, I DON'T HAVE A DISABILITY
☐ I DON'T WISH TO ANSWER

*Krystal Miller*
Your Name

*6/24/17*
Today's Date

12.     In an initial interview Ms. Miller discussed her spelling and reading disability and even gave Ms. McNeff an example of how it could affect errors at work. In June of 2017, after signing some hiring paperwork, Ms. Miller made a contemporary handwritten note to remind herself on Day 1 to ask "should learning disability be on the form of self-disability as there is not an option for learning disability." See Exhibit 4 attached hereto and incorporated herein by reference.

13.     Before accepting the position, Ms. Miller was told that she would have extensive training and be set up for success to be able to grow within the company. However, after she was hired her training consisted of just "shadowing" Ms. Noble for three days and was then told that if she had any other questions, Ms. Maloney and Ms. Noble would be the best resources for her to reach out to.

14.     Plaintiff told Ms. Maloney, her direct supervisor, that she did not feel that she received adequate training from Ms. Noble and would need more support and guidance to be able to be productive in her role as the Human Resources Manager.

15.     When work questions arose, Plaintiff would reach out to Ms. Maloney, Ms. Noble, Ms. McNeff or Genesee Dodge-Caron (Human Resources Manager in Vermont), however, it would often take them hours if not a couple days to respond to her.

16.     Some of the issues were considered urgent, therefore, Ms. Miller would have to act on her own to keep the hiring managers happy and continue to fill the positions Pike Industries needed for paving, etc.   With the lack of support and guidance, errors obviously occured.

17.     On or about November 17, 2017, during a meeting with Ms. Maloney, Ms. Miller recommended that she needed more support and additional training in certain areas given her learning disability that affected comprehension.

18.     Also in November of 2017, there was work done on a personal development plan for Ms. Miller.   At Exhibit 5, page 2 is a copy of notes to "talk to Stacia [Maloney] about learning disability" and how to help Ms. Miller with her "reading and spelling."

19.     Ms. Miller told Ms. Maloney in multiple meetings that due to her learning disability in reading comprehension and spelling she was someone who learns better when she does the work herself and she can be accommodated if someone walks her

through the process by sitting alongside of her because she learned better by being hands on instead of reading material from a handbook or an email.

20.    In January of 2018, after a six months review, Ms. Miller was given a $5,000 increase to her annual salary which was agreed upon in her offer letter based on excellent performance.  At this point, Ms. Miller had been receiving excellent feedback from hiring managers and peers that she connected with daily.

21.    Around the beginning of March 2018, Ms. Miller had a meeting with Ms. Noble who explained some of her concerns and said several times that this "job isn't for everyone" and "there has been so much turnover in this position, about six people within the HR department had left over the last three plus years."

22.    Ms. Miller explained that she felt there was a lot to learn in this position but there was not a structured training program in place other than the three days Ms. Noble sat with her in 2017.

23.    Ms. Miller also reiterated to Ms. Noble that she had shared with the team during the interviewing process that she had a learning disability in reading comprehension and spelling so if she made a mistake constructive feedback about the error would be more helpful as a reasonable accommodation instead of just negative comments.

24.    Ms. Miller also told Ms. Noble that having an understanding of the duties and responsibilities for Pike Industries' sister company, Redimix, would also help as its managers were working with both Ms. Noble and Ms. Miller on hiring workers. However, if Redimix managers had questions and Ms. Miller answered them, Ms.

Noble would become frustrated that she should have answered those questions and not Ms. Miller.

25.     After this March 2018 meeting with Ms. Noble, retaliation and bullying began to take place leaving Ms. Miller feeling she had a target on her back.

26.     During the month of June 2018, Ms. McNeff left Pike Industries for another position to be closer to her home. At this point the Human Resources team discussed who would be responsible for some of Ms. McNeff's duties and responsibilities. Not being her manager, Ms. Miller was not aware of all of Ms. McNeff's responsibilities but she asked for clarification from the team as to who would be handling the drug screen result process after Ms. McNeff's departure.

27.     In early July of 2018, Ms. Miller had two hiring candidates both with the first name of Robert. She received test results for Robert A instead of Robert B. Robert B had started on the job without his drug screen being cleared, instead of Robert A. When this was brought to her attention, Ms. Miller explained to Ms. Maloney what happened, and the leg work Ms. Miller had done to figure out how the mix up took place. Ms. Maloney thanked Ms. Miller for letting her know and doing the leg work to figure out why this mistake was made.

28.     At this point Ms. Miller again reminded Ms. Maloney about her learning disability, and that this was a perfect example of the struggles she would have and then apologized for the mistake. Ms. Maloney then made the comment, while laughing, that "we all have some type of learning disability similar to my husband having dyslexia" and that Ms. Miller just needed to "slow down" and watch what she was doing.

29.     Within a day or two of finding this error Ms. Maloney decided that a written warning would be issued.  Interestingly, when Ms. Miller was handed her written warning there were several spelling mistakes in the first draft.  Ms. Miller explained to Ms. Maloney that she would not be signing the warning until the spelling errors were corrected and the titles of the employees involved were corrected.  Ms. Maloney told Ms. Miller to toss out the original she gave her and not to sign that one.

30.     An example of Ms. Maloney's errors was the title for an employee named Peggy, who was listed on the write up as a "Payroll Clerk," when in actuality she was a "Human Resources Clerk."

31.     When reviewing the final copy of the written warning there were several items still not completed, such as on the left-hand side of the form is a section that asks "warning history," but nothing was noted there.  For the question of "Has the employee been previously warned?" Ms. Maloney checked "No."

32.     Usually at Pike Industries an employee that had performance issues would be warned verbally once or twice and <u>then</u> a written warning would be given once, twice or maybe three times, and next a Performance Improvement Plan ("PIP") would be issued, days without pay would be imposed and then termination came only if all else failed.  Plaintiff observed this pattern because she was Human Resources Manager.

33.     However, because Ms. Miller had a learning disability, Pike Industries jumped from a simple conversation to a warning, which is discriminatory given mistakes that others made including those errors in the write up that was presented to

Ms. Miller from the Human Resources Director stating that Ms. Miller was making too many spelling errors.

34.     On or about August 16, 2018, Ms. Miller met with Ms. Maloney in regards to some feedback she had received from others.  The conversation made Ms. Miller feel like she could not fix any errors that may have been made.  Ms. Miller explained to Ms. Maloney again about her learning disability and the additional training and support she needed, but Ms. Maloney laughed and said, "You need to start learning and leaning on your co-workers in HR."  Ms. Miller replied that when she asked them for help no one was ever available since everyone was so busy.

35.     In the beginning of September of 2018, Ms. Miller reiterated to Ms. Maloney that she felt she needed some additional training on how the different position codes work and who gets vacation or continued service award pay.  Ms. Maloney's answer was to tell her to go speak with Ms. Noble, as Ms. Noble would have the answers.

36.     Ms. Miller tried to reach out to Ms. Noble on multiple occasions with no response, or with the response that Ms. Noble did not have time to help with questions Ms. Miller might have.

37.     On or about September 25, 2018, Ms. Dodge-Caron and Ms. Noble sent out performance evaluation forms to all lines of business managers within the company.  Within a few days, Lisa, the Payroll and Benefits Manager, pointed out there were nine spelling errors in this form.

38.     When both Ms. Noble and Ms. Dodge-Caron were provided with this information neither were reprimanded, given a warning or terminated but were able to correct the document and resend it to the business managers.

39.     This was not the first time Ms. Miller had seen or received something from both of them with errors, but no discipline was given to them thus creating a discriminatory environment for Ms. Miller.

40.     In an email to Tim Vaughn (General Manager of Redimix) and Pete Hebert (Sales Manager of Redimix), Ms. Miller provided an update on a sales position and included a resume of an applicant well qualified for the position.  When emailing her colleagues, Ms. Miller stated something along the lines of "Attached you will find Nicole's resume who is a strong candidate for the sales position at Redimix."  The candidate's resume which was attached was Nicholas,' another perfect example of Ms. Miller's learning disability in reading comprehension and spelling.

41.     Mr. Vaughn addressed this error with Ms. Miller who apologized, agreed it was a mistake, and that the applicant's name was Nicholas, not Nicole.

42.     On the morning of September 26, 2018, Ms. Maloney and Ms. Miller met to discuss what Ms. Miller could do to better enhance her performance and Ms. Miller recommended the following:

> When in meetings the whole Human Resources team, not just her, could work on being both physically and mentally "present," so Ms. Miller could learn, and they could all know 100% what was going on.  Ms. Miller also said that when she was on the road traveling she felt she had to respond to emails right away, but instead would [now] wait until she was in front of her computer to respond to emails and put her "out of office" on when traveling to ensure errors could be corrected.  Lastly, reviewing

all emails, calendar invites or any written communication to ensure she had no mistakes.

43.     At this time, Ms. Miller also told Ms. Maloney again that she had a learning disability in reading comprehension and spelling so sometimes errors might happen.  As mentioned many times before it was helpful for her to see the errors she made since she was a hands on learner due to her learning disability.  Actually seeing a spelling correction, grammar correction, etc. helped her to see and understand where the error occurred.

44.     Ms. Miller also repeated that she still needed a mentor or someone available in a timely manner whenever she had questions, so she could stop feeling like she was on her own little island when she was looking to complete a non-routine task.

45.     During a conversation with Katrina Mumford (Public Relations Specialist) on September 27, 2018, at a career fair two days after Ms. Miller's conversation with Ms. Maloney and Mr. Vaughn, she was made aware that Ms. Noble had mentioned to Ms. Mumford that she could not wait to have an office back in Belmont, New Hampshire since Ms. Noble was always traveling and missed being in Belmont.  Ms. Miller learned that Ms. Noble was selling her camp in Maine, so she only had to worry about selling her house in Maine and then Ms. Noble could finally come back to New Hampshire to work.

46.     While commuting home Ms. Miller thought more about this conversation and it only made her feel more uncomfortable in her job as it showed her that there was a target on her back and that no error was acceptable by Ms. Noble.  Further, the

negative support, retaliation and bullying was not going to change even on multiple occasions where Ms. Miller had asked for help and support due to her learning disability.

47.     On October 1, 2018, Ms. Miller notified Ms. Maloney that she would be working from home because as she did not feel well.  Ms. Miller ended up having a friend take her to Urgent Care because she could not drive herself because of how upset she was.

48.     While at Urgent Care they diagnosed Ms. Miller with vertigo.  All the stress she was putting on herself at work was making her sick to her stomach and her health was suffering.  Ms. Miller felt every move she made was watched and anything she did was critiqued daily like Pike Industries was looking to find the smallest error to knock her down and get her out so Ms. Noble could possibly return to Belmont.

49.     Her doctor advised Ms. Miller it would be best for her to be taken out of work for a week but hearing this only made Ms. Miller feel sicker because she knew how much work she would be missing and what she needed to complete before an upcoming work trip to Atlanta, Georgia.

50.     Once Ms. Miller advised the doctor of her fears, the doctor agreed to let Ms. Miller go back to work on October 3, 2018.

51.     Upon returning to Pike Industries, Ms. Miller adjusted to being back in a hostile work environment and kept her head down to get her workload caught up from being away unexpectedly for a few days.

52.     That week in October, 2018, Ms. Miller had a few interviews scheduled for an open Accounts Payable Assistant Manager position.   These interviews were conducted with Kelli Sargent (Assistant Controller), Sharon Pond (Accounts Payable Manager), Ms. Miller and the internal candidates.

53.     During these interviews one of the questions they discussed with the candidates was something along the lines of "Tell us about a time when you made an error, how did the error get uncovered; and what did you learn from it?"  While asking that question during the interviews, it reminded Ms. Miller that when she had answered this same question during her own job interview, Ms. Miller had made Pike Industries aware of her learning disability and how it might affect her work.

54.     The Accounts Payable candidates had great answers to this question and Ms. Pond and Ms. Sargent even said "we all make errors but as long as you learn something.  That's key since we are human and errors happen."

55.     Now looking back on those interviews, and Ms. Miller's termination from Pike Industries, she has realized that we all make mistakes and its okay to learn from them and move on.   However, those who have learning disabilities in spelling and reading comprehension are terminated instead of being coached, guided, accommodated and supported along the way.

56.     Ms. Maloney and Ms. Miller were in Atlanta on October 9 and 10, 2018, at a training entitled "ADA Bootcamp," which was the first real training Ms. Miller had received about the Americans with Disabilities Act.

57.     On October 18, 2018, Ms. Miller was sent a calendar invite from Ms. Maloney with the title "Catch up Meeting."  When Ms. Miller pulled into the office that day around 7:45 a.m., Ms. Maloney and Ms. Noble were already at the office, which seemed odd to Ms. Miller as Ms. Maloney normally arrived at the office anywhere between 8:15 a.m. - 8:30 a.m. and Ms. Noble usually worked out of Maine.

58.     Ms. Miller headed right into her office to complete some work before the 8:30 a.m. meeting.  At 8:30 a.m. Ms. Maloney came to her office and said, "Are you ready?"  Ms. Maloney said something along the lines of "since we came back from our training in Atlanta, I have learned of a few more errors that you have made.  One being sending a manager an offer letter which had a Continuing Service Award (CSA) on it when the employee should have been a year-round employee eligible for vacation time. I know you corrected it when the manager caught wind of this error but with these mistakes and your lack of attention to details we will be terminating your position today with Pike Industries."

59.     Ms. Miller remembered previously trying to call Ms. Dodge-Caron and Ms. Noble to ask if a Field Mechanic was a year-round position which would give him vacation time or a seasonal position which would give him CSA because she had never hired a Field Mechanic before.

60.     When Ms. Miller had asked Ms. Maloney about it she said she didn't know but did you call Ms. Noble or Ms. Dodge-Caron?

61.     Ms. Miller did the offer letter up with no training or guidance by using a prior offer letter as a guide since her colleagues could not or would not assist her.

62.     Now when Ms. Miller sat quietly during the termination meeting she was in complete shock.

63.     While Ms. Miller was packing up her office, she thought that if her performance was that bad why didn't she get multiple warnings, days without pay or suspension, or even put on a Performance Improvement Plan (PIP) as stated in the employee handbook?

64.     Ms. Miller had also previously met with Mr. Vaughn and Ms. Maloney on September 25, 2018, and she delivered ideas to Ms. Maloney on September 26 as to how a few changes for her and the team could make everyone more accountable for each other's success.

65.     With only 11 days in the office to work on the suggestions after that meeting, no errors were made, however, Ms. Miller had been terminated nonetheless.

66.     Anger and frustration sank in that Ms. Miller was terminated unfairly due to her learning disability in reading comprehension and spelling that Pike Industries would not accommodate.  Ms. Miller's firing was possibly to enable Ms. Noble to come back to work in Belmont as she had mentioned to other coworkers she wanted to do.

67.     Ms. Miller was fired just weeks before her wedding to Eric Binder which created a financial and emotional challenge to say the least.

68.     After discussing how the couple would continue to pay what they could on bills, Ms. Miller made the tough decision to pull all of what she could from her 401(k) and her future husband took a loan for about $7,000 from his 401(k) to help the couple until Ms. Miller found a job.

69.     Beyond the loss of income, losing a job also came with other major losses such as professional identity, personal inadequacy and sense of failure, lost self-esteem and self-confidence, a daily routine, a sense of security and much more.

70.     Ms. Miller on her own filed a timely Charge of Discrimination with the New Hampshire Human Rights Commission on December 31, 2018.  See Exhibit 6.

71.     On March 30, 2020, the Human Rights Commission issued a right to sue letter.  Exhibit 7 attached hereto and incorporated herein by reference.

72.     On May 7, 2020, the U.S. Equal Rights Commission issued its right to sue letter thereby allowing this Complaint to go forward.  Exhibit 8.

## COUNT I
### (Discrimination in Violation of Americans With Disabilities Amendments Act)

73.     The allegations of the preceding paragraphs are repeated and incorporated herein by reference.

74.     At all times relevant to this action, Ms. Miller was a qualified individual with a disability.  Ms. Miller was qualified for her position, as demonstrated by her six month performance review confirming that she consistently met expectations and received a bonus.

75.     At all times relevant to this action, Ms. Miller suffered from disabling impairments limiting her in one or more major life activities, including the major life activity of reading comprehension, taking accurate notes and processing employee paperwork correctly.  *See* 42 U.S.C. §12102(2)(A), as amended.

76.     Ms. Miller was able to perform the essential functions of her job with the reasonable accommodation of additional coaching and more visual feedback to help with her spelling and reading comprehension disability.

77.     The ADA requires employers to provide reasonable accommodations for the known mental impairments of individuals such as Ms. Miller with a disability.  42 U.S.C. §12112(b)(5)(A).

78.     Ms. Miller requested reasonable accommodations in repeated requests as above stated.

79.     Ms. Miller's numerous requests for reasonable accommodations triggered an obligation on the defendant's part, at a minimum, to initiate an interactive process with her to determine whether the accommodations she proposed were reasonable.  29 C.F.R. §1630.2(o)(3).

80.     The defendant discriminated against Ms. Miller on the basis of disability by failing and refusing to participate in any interactive process with her regarding reasonable accommodation, refusing her request for the reasonable accommodation of more coaching and better feedback on spelling errors but instead terminated her employment.

81.     As a direct and proximate result of the defendant's disability discrimination against Ms. Miller, Ms. Miller has suffered and continues to suffer damages, including but not limited to lost wages, lost earning capacity, lost employment benefits, emotional distress, humiliation, inconvenience and loss of enjoyment of life.

82. Ms. Miller is further entitled to punitive damages based on the defendant's malice and/or reckless disregard of the plaintiff's federally protected rights.

## COUNT II
### (Retaliation in Violation of Americans With Disabilities Amendments Act)

83. The allegations of the preceding paragraphs are repeated and incorporated herein by reference.

84. Ms. Miller engaged in protected activity, requesting a reasonable accommodation for her disabling impairment, namely additional coaching and more visual feedback to help with her spelling and reading comprehension disability.

85. The defendant retaliated against Ms. Miller in response to her request for reasonable accommodation by firing her.

86. As a direct and proximate result of the defendant's retaliation against Ms. Miller, Ms. Miller has suffered and continues to suffer damages, including but not limited to lost wages, lost earning capacity, lost employment benefits, emotional distress, humiliation, inconvenience and loss of enjoyment of life.

87. Ms. Miller is further entitled to punitive damages based on the defendant's malice and/or reckless disregard of the plaintiff's federally protected rights.

## COUNT III
### (Violation of RSA 354-A — Disability Discrimination)

88. The allegations of the preceding paragraphs are repeated and incorporated herein by reference.

89.     At all times relevant to this action, Ms. Miller was a qualified individual with a disability.  Ms. Miller was qualified for her position, as demonstrated by her performance reviews confirming that she consistently met expectations.

90.     At all times relevant to this action, Ms. Miller suffered from disabling impairments limiting her in one or more major life activities, including the major life activity of reading comprehension, taking accurate notes and processing employee paperwork correctly.

91.     Ms. Miller was able to perform the essential functions of her job with reasonable accommodation for her spelling and reading comprehension issues.

92.     RSA 354-A requires employers to provide reasonable accommodations for the known mental impairments of individuals such as Ms. Miller with a disability.

93.     Ms. Miller's repeated requests for reasonable accommodations triggered an obligation on the defendant's part at a minimum to initiate an interactive process with her to determine whether the accommodations she proposed were reasonable.

94.     The defendant discriminated against Ms. Miller on the basis of disability by failing and refusing to participate in any interactive process with her regarding reasonable accommodation, refusing her request for the reasonable accommodation of more coaching and better feedback on spelling errors but instead terminated her employment.

95.     As a direct and proximate result of the defendant's disability discrimination against Ms. Miller, Ms. Miller has suffered and continues to suffer damages, including but not limited to, lost wages, lost earning capacity, lost

employment benefits, emotional distress, humiliation, inconvenience and loss of enjoyment of life.

96.     Ms. Miller is further entitled to enhanced compensatory damages based on the defendant's willful and/or reckless disregard of the plaintiff's rights protected under RSA 354-A.

## COUNT IV
### (Retaliation in Violation of RSA 354-A)

97.     The allegations of the preceding paragraphs are repeated and incorporated herein by reference.

98.     Ms. Miller engaged in protected activity, requesting a reasonable accommodation for her disabling impairment, namely requesting additional coaching and more visual feedback to help her spelling and reading comprehension disability.

99.     The defendant retaliated against Ms. Miller in response to her request for reasonable accommodation by firing her.

100.    As a direct and proximate result of the defendant's retaliation against Ms. Miller, Ms. Miller has suffered and continues to suffer damages, including but not limited to lost wages, lost earning capacity, lost employment benefits, emotional distress, humiliation, inconvenience and loss of enjoyment of life.

101.    Ms. Miller is further entitled to punitive damages based on the defendant's malice and/or reckless disregard of the plaintiff's federally protected rights.

REQUEST FOR RELIEF:

WHEREFORE, the plaintiff Krystal E. Miller respectfully prays this Honorable Court:

A.      Schedule this matter for trial by jury, and after trial;

B.      Find the defendant liable for disability discrimination in violation of the Americans With Disabilities Amendments Act;

C.      Find the defendant liable for retaliation in violation of the Americans With Disabilities Amendments Act;

D.      Find the defendant liable for disability discrimination in violation of the New Hampshire Law Against Discrimination;

E.      Find the defendant liable for retaliation in violation of the New Hampshire Law Against Discrimination;

F.      Award the plaintiff damages for lost wages, lost employment benefits and lost earning capacity;

G.      Award the plaintiff compensatory damages, including, without limitation, damages for emotional distress, humiliation, inconvenience and loss of enjoyment of life;

H.      Award the plaintiff punitive damages;

I.      Award the plaintiff enhanced compensatory damages;

J.      Award the plaintiff her reasonable attorney's fees;

K.      Award the plaintiff interest and costs; and

L.      Grant such other and further relief as is just and equitable.

Respectfully submitted,
KRYSTAL E. MILLER
By her attorneys,
DOUGLAS, LEONARD & GARVEY, P.C.

Date:  May 15, 2020          By:    /s/ Charles G. Douglas, III
                                    Charles G. Douglas, III, Bar #669
                                    14 South Street, Suite 5
                                    Concord, NH 03301
                                    (603) 224-1988
                                    chuck@nhlawoffice.com